IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LORA R.,[1]

          Plaintiff,

    v.

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION,

          Defendant.

Case No. 3:25-cv-01439-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Lora R. ("Plaintiff") filed this appeal challenging the Commissioner of Social Security's ("Commissioner") denial of her application for application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g). For the reasons explained below, the Court affirms the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party.

PAGE 1 – OPINION AND ORDER

**STANDARD OF REVIEW**

"As with other agency decisions, federal court review of social security determinations is limited." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). A federal court's review is limited because "[f]or highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)). Adhering to this principle, courts "follow three important rules" in reviewing social security determinations. *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).

First, courts "leave it to the [agency] to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Id.* (quoting *Treichler*, 775 F.3d at 1098). Second, courts "will 'disturb the Commissioner's decision to deny benefits only if it is not supported by substantial evidence or is based on legal error.'" *Id.* (quoting *Treichler*, 775 F.3d at 1098). Third, if the agency "'commits legal error, [courts] uphold the decision where that error is harmless,' meaning that 'it is inconsequential to the ultimate nondisability determination,' or that, despite the legal error, 'the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.'" *Id.* (quoting *Treichler*, 775 F.3d at 1098); *see also Smith v. Kijakazi*, 14 F.4th 1108, 1111 (9th Cir. 2021) ("And even where this modest [substantial evidence] burden is not met, [courts] will not reverse an [agency] decision where the error was harmless." (citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012), *superseded on other grounds by regulation as recognized in Farlow v. Kijakazi*, 53 F.4th 485, 487 (9th Cir. 2022))).

///

PAGE 2 – OPINION AND ORDER

**BACKGROUND**

I.      **PLAINTIFF'S APPLICATION**

Plaintiff was born in May 1970, making her forty-eight years old on August 31, 2018, her alleged disability onset date.[2] (Tr. 57, 83, 93.) Plaintiff is a high school graduate who holds associate's degrees in accounting and business management and has no past relevant work experience. (*Id.* at 57, 78, 231, 1081.) In her DIB application, Plaintiff alleges disability due to migraines, posttraumatic stress disorder ("PTSD"), depression, anxiety, arthritic pain in her hands and feet, and chronic pain in her neck, shoulders, and upper and lower back. (*Id.* at 83, 93, 230.)

The Commissioner denied Plaintiff's application initially and upon reconsideration, and on May 13, 2024, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 48.) On November 20, 2024, Plaintiff and a vocational expert ("VE") appeared and testified at a telephonic hearing held before an ALJ. (*Id.* at 67-81.) On December 23, 2024, the ALJ issued a written decision denying Plaintiff's application. (*Id.* at 48-59.) On July 30, 2025, the Appeals Council denied Plaintiff's request for review, making the ALJ's written decision the final decision of the Commissioner. (*Id.* at 1-6.) Plaintiff now seeks judicial review of that decision.

///

---

[2] "[T]o be eligible for DIB, a claimant must prove continuous disability that began on or before the date last insured[.]" *Hasji v. Kijakazi*, No. 21-15319, 2023 WL 6458648, at *1 (9th Cir. Oct. 4, 2023) (first citing 42 U.S.C. § 423(a)(1)(A), (c)(1); then citing 20 C.F.R. § 404.131; and then citing *Flaten v. Sec'y of Health & Hum. Servs.*, 44 F.3d 1453, 1459 (9th Cir. 1995)); *see also Sam v. Astrue*, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (noting that "only disabilities existing before [the] date last insured establish entitlement to [DIB]" (citing *Vincent v. Heckler*, 739 F.2d 1393, 1394 (9th Cir. 1984) (per curiam))). Thus, to be eligible for DIB, Plaintiff must prove continuous disability that began on or before her date last insured of December 31, 2023. (Tr. 48, 50.)

## II.    THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than [twelve] months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011) (citation omitted). Those five steps are: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant can perform other work that exists in significant numbers in the national economy. *Id.* at 724-25.

To establish a "prima facie case of a disability," a claimant must demonstrate "at steps one through four of the sequential evaluation process that she suffers from a severe impairment that prevents her from doing any work she has done in the past, or that she has a severe impairment and has no relevant past work[.]" *White v. Kijakazi*, 44 F.4th 828, 833 (9th Cir. 2022) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). If the claimant does so, "[t]he burden then shifts to the Commissioner at step five to establish that the claimant can perform a 'significant number[]' of jobs in the national economy given the claimant's physical and mental limitations, age, education, and work experience." *Id.* (first quoting 20 C.F.R. § 416.960(c)(2); and then citing *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002)). "If the Commissioner meets [his] burden, the claimant has failed to establish disability." *Thomas*, 278 F.3d at 955 (simplified).

///

## III.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 48-59.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 31, 2018, her alleged disability onset date. (*Id.* at 50.) At step two, the ALJ concluded that Plaintiff suffered from the following severe, medically determinable impairments: "[A] depressive disorder, anxiety disorder, [PTSD] . . . , migraines, bilateral hand disorder, and spine disorder[.]" (*Id.*) At step three, the ALJ determined that Plaintiff does not suffer from an impairment that meets or medically equals one of the listed impairments. (*Id.* at 51.)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work, subject to these limitations: (1) Plaintiff is not limited with respect to her ability to balance, (2) Plaintiff can never climb ladders, ropes, and scaffolds but can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, (3) Plaintiff can frequently reach, handle, finger, and feel, (4) Plaintiff must avoid exposure to workplace hazards like moving mechanical parts and unprotected heights, and (5) Plaintiff needs to be limited to work that requires only an ability to understand, remember, and carry out simple instructions and tolerate no more than occasional interaction with the public and changes in a routine work setting. (*See id.* at 52-53, addressing balancing, climbing ladders, ropes, and scaffolds, and "all other postural activities"; *cf. id.* at 88, 100, listing each of the relevant postural activities). At step four, the ALJ concluded that Plaintiff has no past relevant work experience. (*Id.* at 57.) At step five, the ALJ determined that Plaintiff was not disabled because a significant number of jobs existed in the national economy that she could perform, including work as a marker, housekeeping cleaner, and router. (*Id.* at 58.)

///

PAGE 5 – OPINION AND ORDER

**DISCUSSION**

In this appeal, Plaintiff argues that the ALJ committed two harmful errors in evaluating her application for benefits. First, Plaintiff argues that the ALJ failed to provide specific, clear, and convincing reasons for discounting her symptom testimony. (Pl.'s Opening Br. at 1, ECF No. 9.) Second, Plaintiff argues that substantial evidence does not support the ALJ's discounting of the opinion of her consultative medical examiner, Joseph Resendiz, D.O. ("Dr. Resendiz"). (*Id.* at 2.) As explained below, the Court concludes that the ALJ's decision is free of harmful legal error and supported by substantial evidence and therefore affirms the Commissioner's decision.

## I.    SYMPTOM TESTIMONY

### A.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (simplified).

### B.    Analysis

There is no evidence of malingering here and the ALJ determined that Plaintiff provided objective medical evidence of underlying impairments which might reasonably produce the

PAGE 6 – OPINION AND ORDER

symptoms alleged. (*See* Tr. 53, reflecting that the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms"). The ALJ was therefore required to provide clear and convincing reasons for discounting Plaintiff's symptom testimony. *See Ghanim*, 763 F.3d at 1163. The ALJ met that standard here.

### 1.    Effective Treatment

First, the ALJ discounted Plaintiff's testimony based in part on record evidence demonstrating that her migraine headaches were not as severe as she alleged because they were effectively controlled with medication. (*See* Tr. 55, reflecting that the ALJ found that the record did not support Plaintiff's "allegations of frequent incapacitating migraines" and noted that Plaintiff's medication "controlled her headaches well"). The ALJ cited a mid-October 2018 treatment record (i.e., less two months after the alleged disability onset date of August 31, 2018) as an example in support of this finding. (*Id.*, citing Ex. 19F at 33, i.e., Tr. 1360). When Plaintiff presented to establish care with a new treating physician on October 18, 2018, she reported that she had been taking "topiramate since around 2012 for chronic daily headaches," which she described as "tension-type headache[s]" that were "not intractable" and her medication "controll[ed] . . . well."[3] (*See id.* at 1360, noting that Plaintiff also reported that she suffered from "arthralgias and stiffness in her hands" but "meloxicam . . . [was] controlling her symptoms" and she was "working [as a] self-employed contract[or] for a wholesale company called dermal source").

///

---

[3] The Court notes that approximately six years before the alleged onset of disability, Plaintiff underwent a stenting of an internal carotid artery aneurysm. (Tr. 1350, 2730, citing this history).

PAGE 7 – OPINION AND ORDER

It is well established that "evidence of medical treatment successfully relieving symptoms can undermine a claim of disability." *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) (citing 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1)). For example, in *Cruz v. Kijakazi*, No. 22-35052, 2023 WL 2009934, at *1 (9th Cir. Feb. 15, 2023), the Ninth Circuit held that the ALJ provided "specific, clear, and convincing reasons to discount [the claimant's] subjective testimony." *Id.* In so holding, the Ninth Circuit explained, among other things, that "the ALJ recognized that although [the claimant did] suffer from chronic pain, her allegations regarding its severity [were] contradicted by her own reports to doctors that her medications were effective at regulating her pain." *Id.* (citing 20 C.F.R. § 416.929(c)(3)(iv))); *see also Connelly v. Colvin*, No. 23-35527, 2024 WL 5040994, at *2 (9th Cir. Dec. 9, 2024) (affirming the ALJ's discounting of the claimant's symptom testimony and noting that the ALJ found that the claimant's "testimony was inconsistent with evidence showing that [his] symptoms could be managed with treatment" (citing *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006))); *Warre*, 439 F.3d at 1006 ("[I]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [disability] benefits.") (simplified).

Plaintiff argues that contrary to the ALJ's finding, the longitudinal record fails to demonstrate that her "migraines were managed with medication." (Pl.'s Opening Br. at 11.) In support of this argument, Plaintiff relies on four treatment records from the relevant period of August 31, 2018 (i.e., her alleged disability onset date) through December 31, 2023 (i.e., her date last insured):

///

- Plaintiff's visit to a chiropractic and wellness center on March 16, 2019, when she reported an increase in headaches and that her medication provided minimal relief;

- Plaintiff's follow-up visit on April 19, 2019, when she reported suffering from constant headaches that she rated as a five out of ten on a ten-point scale;

- Plaintiff's visit to the emergency room on April 18, 2023, when she complained of a worsening headache that had lasted two weeks and caused the attending physician to suspect that she was likely "status migrainosus," i.e., a migraine headache that "does not respond to treatment or lasts longer than [seventy-two] hours," *Snyder v. Comm'r of Soc. Sec.*, No. 22-5948, 2023 WL 3673265, at \*5 (6th Cir. May 26, 2023) (per curiam); and

- Plaintiff's annual exam on November 13, 2023, when she reported on exam that she was "[p]ositive for headaches ([i.e., she had a headache] last week)."

(Pl.'s Opening Br. at 11, citing Tr. 586, 619, 700, 1352; Tr. 700, listing the quote from Plaintiff's annual exam).

The record evidence upon which Plaintiff relies fails to demonstrate reversible error because it does not undermine the ALJ's rational alternative interpretation of the record. *See Jarrett v. O'Malley*, No. 23-3565, 2024 WL 4707890, at \*1 (9th Cir. Nov. 7, 2024) ("[S]imply offering an alternative interpretation of the record does not demonstrate the ALJ committed reversible error.") (citations omitted); *see also Hougas Bisignano*, No. 24-5650, 2025 WL

PAGE 9 – OPINION AND ORDER

2964997, at *1 (9th Cir. Oct. 21, 2025) (finding that the claimant "offer[ed] an interpretation of the record evidence that support[ed] his subjective complaints—but [did] not undermine the ALJ's rational alternative interpretation of the record" and "therefore uphold[ing] the ALJ's conclusion" (citing *Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020))); *Ford*, 950 F.3d at 1154 ("If the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.") (citation omitted).

Notably, Plaintiff fails adequately to address the situational context of her headache complaints in March and April 2019. (*See* Tr. 586, stating that Plaintiff visited a chiropractic and wellness center for "possible treatment of injuries sustained as a result of a motor vehicle collision that occurred on or about [March 13, 2019]," Plaintiff reported suffering from neck pain and headaches, her vehicle was "stopped" when another driver, who was "moving slowly (up to [twenty-five miles per hour])," rear-ended her vehicle, emergency medical services were unnecessary, and she "drove home from the scene"; *cf. id.* at 411, 417, reflecting that on April 19 and May 24, 2019, Plaintiff reported that she achieved at least ninety percent improvement in her condition).

Plaintiff also fails adequately to address record evidence supporting the ALJ's suggestion that during the relevant period, her migraines were less frequent and severe than she alleged. (*See* Tr. 751, demonstrating that when Plaintiff visited her treating physician on April 20, 2023, she reported that she went to the emergency room a "few nights ago" because of a "migraine attack," she was "[n]ot sure what made this [her] wors[t] migraine in [a w]hile," her "[w]ork up [was] negative for acute pathology," and she was "still having residual migraine, but [felt] way better"; *id.* at 1350-53, attaching the records from Plaintiff's emergency room visit on April 18,

PAGE 10 – OPINION AND ORDER

2023). There are numerous examples supporting the ALJ's rational alternative interpretation of the record:

- October 18, 2018: Plaintiff presented to establish care with a new treating physician. (Tr. 1360.) During the visit, Plaintiff reported taking "topiramate since around 2012 for chronic daily headaches," described her headaches as "tension-type headache[s]" that were "not intractable," and stated that her medication was "controlling her [headache] symptoms well." (*Id.*)

- June 17, 2019: Plaintiff's provider observed that Plaintiff's migraines were "not intractable," without "status migrainosus," and "controlled with daily topiramate," Plaintiff's PTSD was "at least partially controlled" with medication, Plaintiff "decline[d] counseling," Plaintiff's chronic pain syndrome worsened after she stopped smoking and gained twenty pounds over the past two and a half months, and he recommended that Plaintiff treat her pain with a "healthy diet and daily exercise starting at [ten] minutes." (*Id.* at 1067.)

- October 4, 2019: Plaintiff informed her provider that her migraines were "not intractable," without "status migrainosus," and "partially controlled" with medication and her PTSD was "partially controlled" with medication. (*Id.* at 1027.)

///

///

PAGE 11 – OPINION AND ORDER

- January 13, 2020: Plaintiff reported that her De Quervain's tenosynovitis[4] was "partially controlled" with medication, her PTSD was "controlled" with medication, and she "recently started exercising at [a] gym twice weekly including water aerobics." (*Id.* at 1017.)

- March 23, 2020: Plaintiff reported that her migraines and PTSD were "controlled" with medication, she lost weight after making "healthier lifestyle choices," and her chronic pain syndrome was "at least partially" controlled" and aided by her "recently started healthier lifestyle choices." (*Id.* at 995; *see also id.* at 1021, stating that on November 27, 2019, Plaintiff requested medication refills and to discuss pain that she was experiencing in her left lateral wrist and thumb, which she described as "worse with movement and work[ing] on [a] computer all day [for her] own business").

- June 17, 2020: Plaintiff was "more active walking," her PTSD was "controlled" with medication, and her migraines were "not intractable," without "status migrainosus," and "controlled" with medication. (*Id.* at 987.)

///

---

[4] "De Quervain's tenosynovitis is a condition affecting the tendons on the thumb side of the wrist." *Laura D. v. Comm'r of Soc. Sec.*, No. 5:21-cv-00445, 2022 WL 4181570, at *5 n.6 (N.D.N.Y. Sept. 13, 2022) (citation omitted), *report and recommendation adopted*, 2022 WL 4591841, at *3 (N.D.N.Y. Sept. 30, 2022). It is considered an "overuse injury," *Poore v. Sec'y of Health & Hum. Servs.*, No. 21-371V, 2025 WL 1453895, at *4 n.3 (Fed. Cl. Apr. 23, 2025) (citation omitted), which "can cause pain and swelling at the base of the thumb and make[] it difficult to turn the wrist, grasp with the fingers, or make a fist." *Laura D.*, 2022 WL 4181570, at *5 n.6.

- September 9, 2020: Plaintiff reported that her migraines, PTSD, and insomnia were all "controlled' with medication and her "[c]hronic pain syndrome [was also] at least partially controlled with meloxicam." (*Id.* at 974.)

- June 21, 2021: Plaintiff's provider noted that her migraines were "not intractable," without "status migrainosus," and "controlled" with medication. (*Id.* at 931.)

- October 20 and October 22, 2021: Plaintiff presented with a commercial driver's license form because she was "applying [to work] as [a] school bus driver" and reported that her migraines were "not intractable," without "status migrainosus," and "at least partially controlled with topiramate." (*Id.* at 916, 920.)

- January 7, 2022: Plaintiff's provider observed that she sought prescription refills, her "[p]ertinent negatives" included "headaches," and her migraines were "not intractable" and without "status migrainosus." (*Id.* at 474-75.)

- August 22, 2023: Plaintiff informed her provider that although she suffered from "persistent migraines," they were "not intractable," "without status migrainosus," and "controlled with topiramate." (*Id.* at 719-20.)

- February 15, 2024: Shortly after her date last insured, Plaintiff stated that she "[u]sually" visits the emergency room once or twice "a year due to severe migraine[s]" but they were "mostly manageable" with topiramate. (*Id.* at 1081.)

PAGE 13 – OPINION AND ORDER

- April 11, 2024: Plaintiff reported only "occasional" headaches that she "treated prophylactically with topiramate" and were "not intractable" and "without status migrainosus." (*Id.* at 3143-44) (bold typeface omitted).

- September 5, 2024: Plaintiff reported "[n]o big migraines" and "just a couple headaches [but] Tylenol ha[d] been helpful" and her provider's impression was that her "migraines have remained at bay." (*Id.* at 3155, 3157.)

- September 23, 2024: Plaintiff "only had one 'mini migraine' which was brought on by a very stressful day" and believed that "continuing topiramate taper [was] still a good idea as [her] migraines [were] largely well controlled." (*Id.* at 3151; *cf. id.* at 1498, reflecting that on April 29, 2024, Plaintiff reported that she was "feeling good, keeping up with things like cleaning better on a regular basis," and "recently . . . ha[d] a high energy cleaning spree day" and she was "very scared of reducing topiramate [due to the] severity of [her] migraines when [they are] not well managed").

- November 20, 2024: Plaintiff appeared to testify at a telephonic hearing before the ALJ and estimated that she resorts to her "rescue medication" for breakthrough migraines "two to three times a month" and during such a migraine "attack[]," she is "incapacitated . . . anywhere from two or three days a week, depending on the severity of the headache." (*Id.* at 75-76.)

///

PAGE 14 – OPINION AND ORDER

Given this evidence, the Court concludes that the ALJ reasonably discounted Plaintiff's testimony based on evidence that her medication was effective in relieving and regulating her migraines. *See Wellington,* 878 F.3d at 876 ("[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability." (citing 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1))); *Cruz,* 2023 WL 2009934, at *1 (affirming the ALJ's discounting of the claimant's symptom testimony, in part because the claimant "suffer[ed] from chronic pain, [but] her allegations regarding its severity [were] contradicted by her own reports to doctors that her medications were effective at regulating her pain") (citations omitted). To the extent Plaintiff argues otherwise, she fails to demonstrate that the ALJ committed reversible error because she offers only an alternative interpretation of the record.[5] *See Jarrett,* 2024 WL 4707890, at *1 ("[S]imply offering an alternative interpretation of the record does not demonstrate the ALJ committed reversible error.") (citations omitted); *see also Ford,* 950 F.3d at 1154 (explaining that "[i]f the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld") (citation omitted).

### 2.    Gaps in Treatment

The ALJ also provided a clear and convincing reason for discounting Plaintiff's testimony regarding the alleged intensity, persistence, and limiting effects of her mental impairments.

///

---

[5] In her opening brief, Plaintiff argues in passing that the ALJ provided no explanation and thus no "valid reasons" for rejecting her testimony about her medication "side effects." (Pl.'s Opening Br. at 12.) In addition to failing adequately to address the record evidence described above, Plaintiff fails to address the ALJ's findings that there was "no evidence of medication side effects"; rather, Plaintiff reported a "good response" to her medication for migraine headaches. (Tr. 55, citing Ex. 12F at 10 & Ex. 19F at 33, i.e., Tr. 1087, 1360; *cf.* Pl.'s Opening Br. at 11-12.)

The ALJ agreed that Plaintiff suffers from "some mental limitations." (Tr. 53.) For this reason, the ALJ's RFC and VE hypothetical included limitations associated with Plaintiff's reports of "low mood," "isolation," and "difficulty being in crowds." (*See id.* at 52-54, 78-80, limiting Plaintiff to "understanding, remembering, and carrying out simple instructions," "occasional public interaction," and "occasional changes in a routine work setting"). The ALJ, however, concluded that Plaintiff's "allegations of debilitating symptoms are not consistent with the medical record," which revealed that her "[m]ental health treatment was minimal and sporadic" during the relevant period of August 18, 2018 through December 31, 2023. (*Id.*, adding that during this period, there is "no evidence" that Plaintiff engaged in "mental health treatment" for PTSD and depression "other than medications"). The ALJ also noted that Plaintiff's reports of improvement and exam results suggested that her mental health symptoms were not as severe as alleged. (*Id.*)

Clear and convincing reasons for discounting a claimant's symptom testimony include "significant gaps in treatment." *Wood v. Busignano*, No. 24-6838, 2025 WL 3527450, at *2 (9th Cir. Dec. 9, 2025). For example, in *Wood*, the Ninth Circuit explained that because "the ALJ did not find evidence of malingering and determined that objective medical evidence established an impairment that could produce the symptoms of which the claimant complained, the ALJ [needed to] offer clear and convincing reasons for rejecting the claimant's testimony." *Id.* (citing *Smartt v. Kijakazi*, 53 F.4th 489, 497 (9th Cir. 2022)). The Ninth Circuit held that the ALJ did just that and thus "did not improperly discount [the claimant's] testimony." *Id.* In support of this holding, the Ninth Circuit explained, among other things, that the ALJ "identified inconsistencies between [the

PAGE 16 – OPINION AND ORDER

claimant's] testimony and the medical evidence in the record" and "observed that there were significant gaps in treatment and an improvement in [the claimant's] mental health," and that "[t]hese reasons [were] sufficiently clear and convincing." *Id.* (citing *Smartt*, 53 F.4th at 497-501); *see also Thomas v. Saul*, 830 F. App'x 196, 198 (9th Cir. 2020) ("The ALJ also pointed to [the claimant's] improvement during treatment and lengthy gaps in treatment that suggest his mental impairments were not as limiting as he testified. Accordingly, the ALJ's decision to discount [the claimant's] testimony was not unreasonable.").

Plaintiff argues that the ALJ erred in discounting her testimony based on her "'minimal and sporadic' treatment during the relevant period" and "improved" mental health symptoms. (Pl.'s Opening Br. at 8.) In support of this argument, Plaintiff emphasizes that the ALJ pointed only to "selective parts" of an October 2018 medical record and otherwise "ignored" a December 2018 medical record demonstrating that she "reported increased depression and requested additional psychiatric medication to combat her symptoms." (*Id.*, first quoting Tr. 53-54; and then citing Tr. 1355-56.) Plaintiff also notes that she "received mental health treatment . . . in 2022 and early 2024 for increased symptoms of depression and additional psychiatric medication." (*Id.*, citing Tr. 653-54, 852-53.)

The Court must uphold the ALJ's discounting of Plaintiff's testimony based on her significant gaps in mental health treatment because the record demonstrates that the ALJ's interpretation was rational. *See Ford*, 950 F.3d at 1154 ("If the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.") (citation omitted); *see also Cody v. Bisignano*, No. 25-3837, 2026 WL

PAGE 17 – OPINION AND ORDER

1470573, at *2 (9th Cir. May 26, 2026) (holding that the ALJ satisfied the clear and convincing reason standard and "discounted [the claimant's] testimony in part because the record indicated that [the claimant] sought minimal treatment" for mental limitations); *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (explaining that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment") (simplified).

The record includes many examples that support the ALJ's findings that during the relevant period, Plaintiff's course of treatment reflected that her mental health symptoms were not as severe as she alleged. (*See, e.g.*, Tr. 325, January 9, 2018, Plaintiff reported that she was "still contemplating seeing a therapist"; *id.* at 936, 974, 1063-67, June 17, 2019, Plaintiff presented to establish care with a new provider, who at times referred generally to her "PTSD/depression," noted that her PTSD was "at least partially controlled" with medication "since 2010," stated that she "decline[d] counselling," and later found that her PTSD was "controlled"; *id.* at 1021-22, 1027, October 4 and November 27, 2019, Plaintiff reported a "[h]istory of partially controlled PTSD"; *id.* at 1017, January 13, 2020, Plaintiff's provider stated that her PTSD was "controlled" with medication and she "recently started exercising at [a] gym twice weekly including water aerobics"; *id.* at 995, 987, March 23 and June 17, 2020, Plaintiff reported that her PTSD was "controlled" with medication; *id.* at 974, September 9, 2020, Plaintiff's provider described her PTSD as "chronic" but "controlled with citalopram"; *id.* at 832, July 13, 2022, Plaintiff was not "[c]urrently . . . seeing a therapist" and was "placed on trazadone to help with PTSD" a decade earlier and following a "robbe[ry]" at her work; *id.* at 1166, October 26, 2022, Plaintiff's exam revealed "[n]o depression" and "[n]ormal affect";

PAGE 18 – OPINION AND ORDER

*id.* at 756-57, January 25, 2023, Plaintiff asked about a "referral to psychiatry" and noted that she had a "history of PTSD and recently increased night terrors and insomnia," she did "not understand[] what triggered" this recent increase, and her provider prescribed her current medications "years ago" and she has "tolerated them very well"; *id.* at 1079, February 1 and 15, 2024, Plaintiff reported that she had not changed her "class" of medications in more than ten years and "[r]ecently started therapy" with a mental health professional; *id.* at 1498, April 29, 2024, Plaintiff presented for a therapy session and reported that "[o]verall[, she] ha[d] been feeling good," she was "keeping up with things like cleaning better on a regular basis," and her "[h]usband ha[d] noticed a positive change").

Plaintiff argues that the ALJ erred in discounting her testimony based on her minimal and sporadic mental health treatment between her alleged onset date and date last insured but also appears to acknowledge that she "received less treatment during th[is] specific period." (*See* Pl.'s Opening Br. at 8, presenting Plaintiff's initial assignment of error before arguing in the alternative that even if she "received less treatment during that specific period, the ALJ first had a duty to consider any possible reasons for the lack of treatment"). Plaintiff suggests that the ALJ's reliance on her course of treatment was misplaced because the ALJ "ignored the reality of [her] overall medical history" by failing adequately to consider that she was "dealing with additional serious health issues that required her attention," i.e., she was rear-ended in March 2019 and later underwent "serious" treatment for "her thyroid and . . . a goiter." (*Id.*, citing Tr. 653-54, 852-53, 1355-66.)

///

PAGE 19 – OPINION AND ORDER

Given the record evidence described above, the Court concludes that the ALJ's interpretation of the record was reasonable and that Plaintiff offers only a rational alternative. Consequently, Plaintiff fails to demonstrate that the ALJ committed reversible error. *See Jarrett*, 2024 WL 4707890, at *1 (stating that "an alternative interpretation is insufficient").

### 3.    Conflicting Objective Medical Evidence

The ALJ also discounted Plaintiff's testimony on the ground that it was inconsistent with objective medical evidence. (Tr. 53-55.) The Court concludes that the ALJ did not err in doing so.

The ALJ explained that such conflicting objective medical evidence included, but was not limited to, imaging related to Plaintiff's "spine disorder." (*See id.* at 55, "Regarding the claimant's spine disorder, while evidence supports some exertional and postural limitations, her allegations of difficulty standing long periods is not consistent with the record. There is remote imaging in the record documenting some findings, but no recent studies. [A computed tomography ('CT')] angiogram in 2012 showed degenerative disc disease at C4-5 and C5-6[,]. . . [a] June 2015 CT angiogram showed mild degenerative disc disease at C5-6, only slightly more advanced compared to the prior study[,] . . . [and a] January 2011 [magnetic resonance imaging ('MRI')] of the lumbar spine showed mild facet hypertrophy at L5-S1 but no acute pathology, disc protrusion or nerve root[.]" (citing Ex. 18F at 77 & Ex. 24F at 227, 588, i.e., Tr. 1309, 1767, 2128.) The ALJ added that Plaintiff exhibited full "[m]otor strength" in her "upper and lower extremities" during Dr. Resendiz's consultative exam. (*Id.*, citing Ex. 14F, i.e., Tr. 1096-1103.)

"Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in [the] credibility analysis." *Stenberg v. King,*

PAGE 20 – OPINION AND ORDER

No. 23-35617, 2025 WL 501402, at *1 (9th Cir. Feb. 14, 2025) (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)). After recognizing this principle, Plaintiff argues that the "objective evidence was not inconsistent with [her] statements regarding her back pain." (Pl.'s Opening Br. at 10.) In support, Plaintiff cites exams revealing that she exhibited reduced range of motion in her spine and moderate to severe muscle spasms in her upper back and neck. (*Id.*) (simplified).

The Court concludes that the records upon which Plaintiff relies fail to undermine the ALJ's partial reliance on her imaging. Even if that were not the case, the Court must still uphold the other clear and convincing reasons that the ALJ provided for discounting Plaintiff's symptom testimony.

For all of these reasons, the ALJ did not commit reversible error in discounting Plaintiff's symptom testimony because the ALJ provided clear and convincing reasons for doing so.

## II.    MEDICAL OPINION EVIDENCE

### A.    Applicable Law

"In January 2017, the Social Security Administration issued revised regulations for evaluating medical opinions relating to claims filed on or after March 27, 2017."[6] *Cross v. O'Malley*, 89 F.4th 1211, 1214 (9th Cir. 2024) (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (codified at 20 C.F.R. pts. 404 & 416)). The revised "regulations provide that ALJs will no longer 'defer or give any specific evidentiary weight' to any medical opinion." *Id.* (quoting 20 C.F.R. § 416.920c(a)). Instead, "ALJ[s] must assess the persuasiveness of each medical opinion after considering

---

[6] The parties agree the revised regulations apply because Plaintiff filed her application after March 27, 2017. (*See* Pl.'s Opening Br. at 13 & Def.'s Br. at 11-12, ECF No. 11, describing the standard).

PAGE 21 – OPINION AND ORDER

specified factors." *Stiffler v. O'Malley*, 102 F.4th 1102, 1106 (9th Cir. 2024) (first citing *Woods v. Kijakazi*, 32 F.4th 785, 791-92 (9th Cir. 2022); and then citing 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(b)).

Specifically, the revised "regulations require an ALJ to discuss the supportability and consistency of medical evidence—the factors the agency has historically found to be the most important in evaluating medical opinions—while allowing for discussion of other factors listed in paragraphs (c)(3) through (c)(5), as appropriate." *Cross*, 89 F.4th at 1215 (citing 20 C.F.R. § 416.920c(a)); *see also Woods*, 32 F.4th at 791 ("'The most important factors' that the agency considers when evaluating the persuasiveness of medical opinions are 'supportability' and 'consistency.'" (quoting 20 C.F.R. § 404.1520c(a))). "Supportability focuses on whether 'a medical source supports a medical opinion by explaining the relevant objective medical evidence.'" *Stiffler*, 102 F.4th at 1106 (quoting *Woods*, 32 F.4th at 791-92); *see also Kitchen v. Kijakazi*, 82 F.4th 732, 740 (9th Cir. 2023) ("Supportability concerns how 'a medical source supports a medical opinion' with relevant evidence[.]" (quoting *Woods*, 32 F.4th at 791-92)). "Consistency means the extent to which a medical opinion is consistent with the evidence from other medical sources and nonmedical sources[.]" *Stiffler*, 102 F.4th at 1106 (quoting *Woods*, 32 F.4th at 792).

In addition to supportability and consistency, "[a]n ALJ may discuss other factors [listed in paragraphs (c)(3) through (c)(5)], such as the medical source's 'relationship with the claimant' or 'specialization,' but generally has no obligation to do so." *Cross*, 89 F.4th at 1214 (citing 20 C.F.R. § 416.920c(b)(2)). If, however, an ALJ concludes that "two or more contradictory medical opinions 'both equally well-supported . . . and consistent with the record[,]' . . . the regulations

mandate discussion of these other factors." *Id.* at 1214 (quoting 20 C.F.R. § 416.920c(b)(3), (c)(3)-(5)).

Where, as here, the new regulations apply, a district court reviews the ALJ's evaluation of a medical opinion for substantial evidence. *See Woods*, 32 F.4th at 787 ("For claims subject to the new regulations, . . . an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence."); *id.* at 792 ("Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."); *Metcalf v. Kijakazi*, No. 22-35201, 2022 WL 17592194, at *1 (9th Cir. Dec. 13, 2022) (observing that "under the revised regulations . . . , the ALJ's evaluation of a medical opinion is reviewed for substantial evidence" (citing *Woods*, 32 F.4th at 789)); *see also Stiffler*, 102 F.4th at 1108 ("In sum, the ALJ's evaluation of [the physician's] medical opinion is supported by substantial evidence.").

### B.    Analysis

Plaintiff argues that substantial evidence does not support the ALJ's evaluation of the opinion of the consultative medical examiner, Dr. Resendiz. (Pl.'s Opening Br. at 2, 12-16.) The Court disagrees.

#### 1.    Dr. Resendiz's Opinion

On November 15, 2022, Oregon's Disability Determination Services referred Plaintiff to Dr. Resendiz for a consultative exam. (Tr. 1097-1103.) Although "[n]one" of Plaintiff's records were "available" to review, Dr. Resendiz conducted a clinical interview and physical exam. (*Id.* at 1099-1103.)

During Dr. Resendiz's clinical interview, Plaintiff complained primarily of arthritic "pain in her neck, hands and back" and reported that past imaging "showed arthritic changes" in "all

PAGE 23 – OPINION AND ORDER

these areas" and a "disk issue" in her cervical spine. (*Id.* at 1099.) Plaintiff also reported that her "wors[t] pain" was in the lumbar region of her back "but this varie[d]," her physical and chiropractic therapy "helped temporarily," and she never underwent an MRI of her back or received "steroid injections" or a referral to "neurosurgery, orthopedics, or rheumatology." (*Id.*) Plaintiff added that she performed only limited household chores (i.e., "dishes in short spurts") and often required assistance and could lift about ten to fifteen pounds, walk about one to two blocks, and stand for about ten to fifteen minutes before "having to stop and rest." (*Id.* at 1099-1100.)

During his physical examination, Dr. Resendiz identified "no evidence of poor effort or inconsistencies" and observed that Plaintiff was "emotionally stable," appeared to "sit[] comfortably," exhibited an ability "easily . . . to transfer from the chair to the examination table" and take "her shoes off without difficulty," and "walk[ed] to the examination room without difficulty." (*Id.* at 1100.) Dr. Resendiz also observed that Plaintiff exhibited (1) full "motor strength/muscle bulk and tone" in her "upper and lower extremities bilaterally," (2) full "[g]rip strength . . . bilaterally," (3) normal "muscle bulk and tone" and "[s]ensation to touch and pinprick in all fingers," (4) "[g]rossly intact" sensation to "light and deep touch," (5) a "normal" gait without any signs of limping, (6) an ability to "squat halfway down," "tandem, tiptoe and heel walk," "grip and hold objects securely to the palm by the last three digits," "grasp and manipulate both large and small objects with the first three digits," and function her thumb with "normal opposition," (7) reduced range of motion in certain joints and areas of her body, (8) a positive straight leg raise at forty-five degrees "on the left" and while in the "seated position," (9) "no paravertebral muscle spasms, tenderness, crepitus, effusions, deformities, or trigger points," and (10) no evidence of atrophy, myotonia, grip release, "diminution of function with

PAGE 24 – OPINION AND ORDER

repetition," "spasticity or ataxia," or "localized tenderness, erythema, or effusion." (*Id.* at 1101-02) (simplified).

Based on his interview and physical exam, Dr. Resendiz's diagnoses were osteoarthritis "affecting [the] hands, neck, and sacroiliac joint," lower back pain stemming from "sacroiliitis due to degenerative joint disease," left-sided De Quervain's tenosynovitis, and neck pain with decreased range of motion, which was "mostly secondary to her recent thyroid surgery" although Plaintiff also reported being "told she has degenerative joint disease and a 'disk problem.'" (*Id.* at 1102.) With respect to his functional assessment, Dr. Resendiz, relying on "both subjective and objective findings," found that Plaintiff can stand and walk for up to thirty minutes at a time, sit and reach without limitation, and occasionally lift, carry, push, and pull ten pounds, climb, balance, stoop, kneel, crouch, and crawl, handle, finger, and feel, and must avoid any exposure to workplace hazards, such as unprotected heights and heavy machinery. (*Id.* at 1102-03.)

### 2.     The ALJ's Decision

The ALJ found Dr. Resendiz's opinion "not persuasive." (Tr. 57.) The ALJ explained that Dr. Resendiz's opinion regarding Plaintiff's ability to stand and walk, lift and carry, and occasionally handle, finger, and feel were "not supported by his [own] exam," which revealed that Plaintiff "exhibited normal gait, normal gross/fine motor skills, no paravertebral muscle spasms, tenderness, or crepitus, and normal muscle strength and tone[.]" (*Id.*, citing Ex. 14F at 6-7, i.e., Tr. 1101-02.) The ALJ further explained that Dr. Resendiz's opinions regarding Plaintiff's standing, walking, lifting, carrying, and manipulative limitations were also "inconsistent" with Plaintiff's "conservative treatment" and "other exams of record," which revealed that Plaintiff exhibited a normal "gait and station," "range of motion," and "strength and sensation[.]" (*Id.*, citing Ex. 8F at 35 & Ex. 19F at 25, 35, i.e., Tr. 529, 1352, 1362.) After adding that Plaintiff underwent only "sporadic chiropractic treatment for her pain complaints" and did "not require[]

PAGE 25 – OPINION AND ORDER

other treatment for musculoskeletal impairments," the ALJ determined that "[o]verall,"
Dr. Resendiz's exam "provide[d] more support" for the ALJ's RFC than his "own" functional
assessment. (*Id.*)

### 3.    Disposition

Contrary to Plaintiff's argument, substantial evidence supports the ALJ's evaluation of
Dr. Resendiz's opinion. *See Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) ("[T]he
threshold for [substantial] evidentiary sufficiency is not high. Substantial evidence . . . is more
than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." (quoting *Biestek v. Berryhill*, 587 U.S. 97,
103 (2019))).

Under the revised regulations, an "ALJ 'must articulate how persuasive [he] finds all of
the medical opinions from each doctor or other source, and explain how [he] considered the
supportability and consistency factors in reaching these findings.'" *Stiffler*, 102 F.4th at 1106
(quoting *Woods*, 32 F.4th at 792). Consistency concerns the extent to which a "medical opinion is
consistent with the evidence from other medical and nonmedical sources," *Kitchen*, 82 F.4th at
740 (quoting *Woods*, 32 F.4th at 792), and "[s]upportability focuses on whether 'a medical source
supports a medical opinion by explaining the relevant objective medical evidence.'" *Stiffler*, 102
F.4th at 1106 (quoting *Woods*, 32 F.4th at 791-92); *cf. Kitchen*, 82 F.4th at 740 ("Supportability
concerns how 'a medical source supports a medical opinion' with relevant evidence.")
(simplified).

In this case, the ALJ appropriately addressed supportability by finding that Dr. Resendiz's
opinions regarding Plaintiff's ability to stand and walk for thirty minutes at a time, occasionally
lift and carry ten pounds, and occasionally handle, finger, and feel were "not supported by his
[own] exam," which revealed that Plaintiff "exhibited normal gait, normal gross/fine motor

PAGE 26 – OPINION AND ORDER

skills, no paravertebral muscle spasms, tenderness, or crepitus, and normal muscle strength and tone[.]" (Tr. 57, citing Ex. 14F at 6-7, i.e., Tr. 1101-02.) The Ninth Circuit has found comparable findings sufficient under the revised regulations. *See Morrow v. Bisignano*, No. 24-3711, 2025 WL 1924900, at *1 (9th Cir. July 14, 2025) (holding that the ALJ considered the supportability and consistency factors and noting that the "ALJ addressed supportability" by "finding that [a primary care physician's] opinions regarding [the claimant's] physical limitations [were] not supported by his own examination findings" and "cit[ing] medical records" identifying no abnormalities in terms of, among other things, the claimant's gait and "strength in his lower extremities").

Plaintiff argues that the ALJ's supportability finding is misplaced because Dr. Resendiz's exam "did include finding[s] that supported his opined limitations," namely, he noted that Plaintiff exhibited "reduced range of motion in [her] back, neck, shoulder, and wrist" and Plaintiff's straight leg raise test was "positive on the left side" and caused Plaintiff to report "'sharp' low back pain." (Pl.'s Opening Br. at 14, citing Tr. 1101-02.) Plaintiff also notes that Dr. Resendiz identified the diagnoses that supported the functional limitations that he assessed. (*Id.*, citing Tr. 1102-03; *see also* Tr. 1102-03, citing Plaintiff's osteoarthritis and lower back pain in support of her standing and walking limitations, De Quervain's tenosynovitis in support of her manipulative limitations, and osteoarthritis, lower back pain, "[n]eck pain with reduced range of motion . . . th[at was] mostly secondary to her recent thyroid surgery," and De Quervain's tenosynovitis in support of her lifting, carrying, pushing, pulling, postural, and environmental limitations).

Plaintiff argues that the "record could be interpreted to support the discounted portions" of Dr. Resendiz's opinions, but the Court "must uphold the ALJ's determination where . . . it is

PAGE 27 – OPINION AND ORDER

based on reasonable interpretation of the evidence." *Cody*, 2026 WL 1470573, at *1 (citing *Terry v. Saul*, 998 F.3d 1010, 1013 (9th Cir. 2021)). The ALJ reasonably concluded that Dr. Resendiz's limitation to thirty minutes of standing and walking and occasional handling, fingering, feeling, and lifting and carrying of ten pounds or less conflicted with his findings that Plaintiff exhibited normal gait, "no paravertebral muscle spasms, tenderness, or crepitus," and full muscle strength and tone in her bilateral upper and lower extremities and grip.[7] (*See* Tr. 57, citing Tr. 1102-03); *Tommasetti v. Astrue*, 533 F. 3d 1035, 1041 (9th Cir. 2008) (affirming an ALJ's discounting of a provider's opinions because her findings conflicted with and failed adequately to support such opinions).

With respect to the consistency factor, Plaintiff similarly offers an alternative interpretation of the "overall record" with respect to her "difficulties with range of motion and chronic pain in her hands, neck, back, and shoulders." (Pl.'s Opening Br. at 15.) Plaintiff also emphasizes that the three examples the ALJ cited also included "some positive objective findings" and concerned "unrelated medical conditions, such as a positive COVID test[.]" (*Id.*) (simplified).

---

[7] It is also noteworthy that the ALJ provided clear and convincing reasons, supported by substantial evidence, for discounting Plaintiff's symptom testimony because "[n]one" of Plaintiff's medical records were "available" for Dr. Resendiz to review and Dr. Resendiz made it clear that he based his opinions regarding Plaintiff's "[f]unctional limitations . . . on both subjective and objective findings," which, unlike the ALJ, he found "consistent." (*See* Tr. 53-57, discounting Plaintiff's symptom testimony and finding other opinions "partially persuasive" and more consistent with the overall record and Plaintiff's "intact motor strength and normal gait"; *see also* Tr. 1102, setting forth Dr. Resendiz's statements regarding his review of records and reliance on "both subjective and objective findings" in opining on Plaintiff's "[f]unctional limitations"). These considerations provide additional support for declining to disturb the ALJ's reasonable evaluation of the supportability factor. *See Fenton v. Colvin*, No. 6:14-cv-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) (noting that a court is "not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but [it] . . . is permitted to consider additional support for a ground on which the ALJ relied" (citing *Warre*, 439 F.3d at 1005 n.3)).

PAGE 28 – OPINION AND ORDER

Plaintiff fails to demonstrate reversible error. Notably, Plaintiff fails adequately to address the ALJ's reliance on her "sporadic" and relatively conservative course of treatment and related justifications for finding more persuasive other medical providers' unchallenged medical opinions. (*Compare* Pl.'s Reply Br. at 1-4, ECF No. 12, *and* Pl.'s Opening Br. at 14-16, *with* Tr. 56-57.)

In the end, an "ALJ is responsible for studying the record and resolving any conflicts or ambiguities in it." *Diedrich v. Berryhill*, 874 F.3d 634, 638 (9th Cir. 2017) (citation omitted); *see also Slayton v. O'Malley*, No. 22-16883, 2024 WL 637482, at *1 (9th Cir. Feb. 15, 2024) ("The ALJ 'is charged with determining credibility and resolving . . . conflict[s]' between medical evidence." (quoting *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012))). The ALJ reasonably did so here. (*See supra* Part I.B.1.-3. & Part II.B.3.; Tr. 1067, June 17, 2019, Plaintiff's provider recommended that she treat chronic pain with "healthy diet and daily exercise starting at [ten] minutes"; *id.* at 1017, January 13, 2020, Plaintiff "recently started exercising at [a] gym twice weekly including water aerobics"; *id.* at 974, September 9, 2020, Plaintiff's "[c]hronic pain syndrome [was] at least partially controlled with meloxicam"; *id.* at 868-69, March 30, 2022, Plaintiff's provider recounted that she suffered from "[j]oint pain" for "[m]any y[ea]rs . . . but [her] diagnosis [was] only arthritis"; *id.* at 729, May 17, 2023, Plaintiff's provider "encouraged [her] to start more [low impact] exercise like yoga" and identified "exercise" as the primary plan for treating her chronic pain syndrome).

In sum, the Court finds that substantial evidence supports the ALJ's evaluation of Dr. Resendiz's opinion.

///

///

PAGE 29 – OPINION AND ORDER

## CONCLUSION

For the reasons stated, Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence in the record.

**IT IS SO ORDERED.**

DATED this 24th day of June, 2026.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 30 – OPINION AND ORDER